[No. 3452-1.    Division One.    March 29, 1976.]

THE STATE OF WASHINGTON, *Respondent*, v. KURT L. MODESKY, *Appellant*.

*Peter G. Rothschild* of *Snohomish County Public Defender,* for appellant.

*Robert E. Schillberg, Prosecuting Attorney,* and *Thomas J. Wynne, Deputy,* for respondent.

SWANSON, J.—Kurt L. Modesky appeals from the judgment and sentence entered on a verdict finding him guilty of violating the furlough statute, RCW 72.66.060.[1]

The information charged that Modesky escaped from the Washington State Reformatory by his willful failure to return from furlough to the reformatory on January 25, 1972. The State presented evidence that Modesky left the prison on January 21, 1972, pursuant to an order of furlough which required that he return January 25, 1972. The prosecution then sought to prove Modesky's failure to return on January 25 by the testimony of Oliver K. Jergensen, Supervisor of Records and Identification at the reformatory. Jergensen was permitted to testify over objection that the reformatory records, consisting of population sheets for January 25, 1972, contained no record of Modesky's having returned to the institution on that date.[2] The pertinent portion of his testimony is as follows:

---

[1] RCW 72.66.060 states in pertinent part,

"Any furloughed prisoner who wilfully fails to return to the designated place of confinement at the time specified in the order of furlough shall be deemed an escapee and fugitive from justice, and upon conviction shall be guilty of a felony and sentenced to a term of confinement of not more than ten years."

[2] Population sheets were described in the testimony of Mr. Jergensen as follows: "The population sheets are originated from our office, and they are prepared whenever someone is admitted or leaves the institution. They carry two figures on them—one a count figure and one a population figure. Count figures on the report shows all of those prisoners who are physically incarcerated in the institution. The population figure would include those who are incarcerated plus those who are in on some other type of removed status from the information."

When asked how he knew who was present and not present at the reformatory on any given date, Jergensen stated, "The figure that we provide is tallied or confirmed by physical head counts of those people within the institution. In other words, if we come up with a figure of 630 prisoners, the custody staff would have to get a head count and come up with 630 people."

Q Mr. Jergensen, if Mr. Modesky had, in fact, been a resident of the Reformatory on that date, would his name appear in the counts in the population sheets?
A Yes.

. . .

Q Okay. Based upon your examination of the population sheets, is there any record of Mr. Modesky being at or having returned to the institution on the 25th of January, 1972?
A There is no indication of his having returned on that date.

Due to illness, Jergensen was not at the reformatory on January 25 and had no personal knowledge of Modesky's presence or absence on the critical date apart from the reformatory records,[3] which were compiled under his supervision. Neither the population sheets nor the log kept of persons on escape status was produced, and no showing was made that production of such documents was impractical, difficult, or impossible.[4] The State's only other witness, Correctional Sergeant John J. Jamison, testified that he traveled to Austin, Texas, on May 14, 1974, where he placed Modesky in custody and returned him to the Washington Correctional Center at Shelton. On this evidence the case was presented to the jury, a guilty verdict was returned, and judgment and sentence entered. This appeal followed.

The determinative issue on appeal is the admissibility of Jergensen's testimony that his examination of the population sheets disclosed no record of Modesky's presence at the reformatory on January 25, 1972. It is a fundamental principle of the law of evidence that "in proving the terms of a writing, where such terms are material, the original writing must be produced, unless it is shown to be unavailable for some reason other than the serious fault of

[3]It is thus clear that we do not, as in *State v. Swanson*, 73 Wn.2d 698, 440 P.2d 492 (1968), and *State v. Stevens*, 135 Wash. 361, 237 P. 723 (1925), deal with proof of an independently known fact which happened also to be recorded in a document.

[4]The record suggests that copies of the reports containing the population counts were in the possession of records officer Jergensen, who testified, "They were done in the normal course of business, and prior to my coming down here, I made Zerox copies of those reports."

the proponent." C. McCormick, *Law of Evidence* § 196 (1954). As stated in *Gordon v. United States*, 344 U.S. 414, 421, 97 L. Ed. 447, 73 S. Ct. 369 (1953), the wisdom of the best evidence rule rests on the fact that a document is a more reliable, complete, and accurate source of information as to its contents and meaning than anyone's description. The State seeks to justify its substitution of Jergensen's oral testimony for the reformatory population sheets on the ground that evidence of the *nonexistence* of an entry in a record book is not proof of the contents or terms of the document and therefore does not violate the rule.

The State contends its position is supported by *State v. Gilman*, 63 Wn.2d 7, 385 P.2d 369 (1963). In *Gilman* the defendant claimed he was in Portland, Oregon, purchasing a bottle of liquor at a certain liquor store during the commission of the crime with which he was charged. It was shown that to buy a bottle of liquor in Oregon one must produce a state liquor permit and sign the sales slip, and the store manager was permitted to testify over objection that he had examined all of the sales slips for that day, that the signature of the defendant appeared on none of them, and that none were missing. The defendant argued that the liquor store manager's testimony was erroneously received because the best proof of a writing's content is the writing itself, and all other evidence is secondary. The *Gilman* court said at page 10,

> We agree that the document itself is the best evidence of its contents (4 Wigmore on Evidence (3d ed.) § 1242), but we do not conceive the evidence given here to be for this purpose. Rather, its purpose was to show that no such document existed. That a negative may sometimes be proved by describing the results of a search of records and files is confirmed by Professor Wigmore when he says:
> "On the other hand, the fact that an *entry* in a record or account-book *does not exist*, while in a sense it involves the document's terms, yet is *usually* and properly regarded as not requiring the books' production for proof; . . ." 4 Wigmore on Evidence (3d ed.) § 1244;

and citing our decision in *Hoptowit v. Brown*, 115 Wash. 661, 198 Pac. 370, in support of the statement.

We note the word *usually* in the foregoing statement, for occasions may arise when the court, in the exercise of its discretion, will find that an examination of the same records and files by the adverse party should be allowed in the interest of fair play and substantive due process.

We do not believe *Gilman* dictates affirmance in the case at bench. The testimony in *Gilman* was offered to show that a certain document—the sales slip with the defendant's signature upon it—did not exist. *Accord, Hoptowit v. Brown*, 115 Wash. 661, 198 P. 370 (1921).[5] In the instant case, Jergensen's testimony was not offered to show that no document existed, but rather that Modesky's name was missing from the document which purported to include the names of all of the current residents of the reformatory. He was therefore in effect testifying as to the contents of the document and what it disclosed by stating that a certain name was not included. This precise situation was recognized in C. McCormick, *Law of Evidence* § 198, at 411 (1954):

> The question sometimes arises whether it is competent, without producing the books or records, to give evidence that the books or records do *not* contain any entry of a particular character. Such negative evidence is ordinarily

---

[5]Although *State v. Johnson*, 180 Wash. 401, 40 P.2d 159, *appeal dismissed*, 296 U.S. 535, 80 L. Ed. 381, 56 S. Ct. 105 (1935), has been cited for the same proposition, R. Meisenholder, *Evidence Law and Practice* § 92, at 108 & n.26 (5 Wash. Prac., 1965), that decision seems clearly to have permitted oral testimony as to the contents of a document:

> A witness for the state was permitted to testify that he had checked the minutes of American Bank for the month of January, 1931, and that there was no *legal* resolution authorizing the loan to the appellants or to Davies,

*State v. Johnson, supra* at 410. We do not, however, view *Johnson* as clear precedent for application of the best evidence rule; a careful reading of that opinion suggests that the true basis for the decision was the court's determination that admission of the testimony was harmless error. *See also State v. Pappas*, 195 Wash. 197, 80 P.2d 770 (1938), which approved the receipt of testimony that a generally described document existed, but pointed out at page 200 that "the testimony of the officers was not with respect to its terms . . . ."

deemed not to be testifying to the contents of the records and not to require their production. *But it is apparent that it might go to such extremes as actually to amount to a description of the entries that are in the books, by stating what they are not, and would then come within the rule requiring production.*

(Footnotes omitted. Second italics ours.) In *Williams & Guyon v. Davis*, 56 Tex. 250, 253 (1882), the case cited by Professor McCormick to support the quoted sentence upon which we place emphasis, the best evidence rule was violated when the trial court permitted the attorney of a probate estate to testify, "From strict examination I know the records of Polk county and San Jacinto county do not disclose that said estate has ever been distributed and closed."[6]

If the record involved in the case before us were a list of those absent from the reformatory on the date in question, rather than a list of those present, and such a list included Modesky's name, clearly oral testimony would not be admissible to prove that Modesky's name was included within the record, absent justification for failure to produce it. *See generally* 5 R. Meisenholder, Wash. Prac. § 95 (1965, Supp. 1975). In the circumstances of this case, evidence of the absence of Modesky's name from a list of residents of the reformatory on the day in question is no less affirmative evidence of the content of the record. The proof of what something is not may prove what it is, and that is what is involved here.[7]

The underlying reasons for adherence to the rule are well stated in S. Gard, *Jones On Evidence* § 7:1, at 86 (6th ed. 1972):

Underlying the rule are the presumptions that impugn

[6]We also note that the witness in *Gilman* had the sales slips with him, and the defendant declined an offer to have them put in evidence. In the case at bench, Jergensen had copies of the documents with him, but no effort was made to present them.

[7]The State's attempt to find refuge in the language of CR 44(b) is also unavailing, given our view that Jergensen's testimony does not fall within the legitimate absence-of-entries exception to the best evidence rule.

the motive of a party who withholds primary evidence and attempts to substitute therefor evidence of an inferior grade, the innocent, sometimes sinister, fallibility and inaccuracy of human understanding and memory—particularly that of persons interested in the result—and the possibility, often strong probability, of error in copies of documents which may be of the highest importance in the litigation. Enforcement of the rule serves the double purpose of providing the most satisfactory evidence which is available and of preventing the frauds which would frequently attend the proof of the contents of writings by oral testimony.

Another important aim of the best evidence rule is to allow, whenever possible, the opponent to examine the documentary original.

(Footnotes omitted.) In the absence of any justification for the failure to produce the reformatory record, the admission of Jergensen's testimony was error requiring a new trial. We therefore do not reach defendant's other assignments of error.

Reversed and remanded.

WILLIAMS, C.J., and JAMES, J., concur.

Petition for rehearing denied July 22, 1976.

Review denied by Supreme Court December 14, 1976.